IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MARIO AUSTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:19-CV-1059-RAH-KFP |
| | ) | |
| AMERICAN BUILDING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff Mario Austin, proceeding *pro se*, filed this lawsuit against Defendant American Building Company ("ABC"), alleging ABC discriminated against him based on his race, color, and national origin in violation of Title VII. ABC filed a motion for summary judgment (Doc. 43) and supporting memorandum (Doc. 44), and Plaintiff filed a response (Doc. 47).[1] Based on the parties' submissions and the relevant law, the undersigned RECOMMENDS that ABC's motion (Doc. 43) be GRANTED and this case be DISMISSED.

## I.   PROCEDURAL HISTORY

On December 14, 2018, Plaintiff filed a Charge of Discrimination with the EEOC alleging that, on or about December 7, 2018, ABC terminated him from his position as a

---

[1] Plaintiff's one-paragraph response is entitled "Order" and states, "I agree with defendant American Building Company motion for summary judgement." Doc. 47. However, on May 20, 2021, the undersigned held a telephone conference with the parties to discuss ABC's summary judgment motion and Plaintiff's response, during which Plaintiff indicated he does oppose the motion. *See* Doc. 55.

shear operator because of his race. Doc. 1 at 9. On October 28, 2019, the EEOC issued

Plaintiff a Dismissal and Right to Sue letter. *Id.* at 8.

On November 22, 2019 (within the requisite 90-day filing period), Plaintiff initiated

this lawsuit by filing a standard form Complaint for Employment Discrimination asserting

claims under Title VII. Doc. 1 at 3. He indicated that, at some point between August 27,

2018 and December 2, 2018, ABC terminated him, subjected him to unequal terms and

conditions of employment, and retaliated against him based on his race, color, and national

origin. *Id.* at 4-5. In support of his purported claims, he stated the following allegations in

their entirety:

> I was discriminated against because white employee shear operator Wayne
> Medley was not placed on weekly evaluation nor fired for poor performance
> during his probationary period. I was given an occurrence due to having to
> get off work early because of the hurricane Michael. We had a road curfew
> which was 2 am on October 9, 2018 and I was given an occurrence because
> I had to get off work early. The police was arresting people that was on the
> road after 2 am.

*Id.* at 5. As relief, he sought 2.5 million dollars. *Id.* at 6.

On November 27, 2019, Plaintiff filed a handwritten Amended Complaint

elaborating on the allegations in his initial Complaint. Doc. 5. For instance, he alleged that

he was working night shift on October 9, 2018, when the "Donalsonville GA Sheriff

Department informed all citizen[s] that we had a road curfew and that if anyone was caught

on the road after 2 am they would be arrested." *Id.* at 1. Plaintiff stated that he "live[d] 1

hour and a half from [ABC]" and, therefore, he "had no choice but to get off early or risk

[his] freedom by getting arrested." *Id.*

He further alleged that "[w]hite employee Wayne Medley was giv[en] more opportunities than [him] during his probationary period" and, even though Medley's work performance was "extremely poor," he was never placed on a weekly evaluation. *Id.* at 2. Medley "bragged to [Plaintiff] one night about how he messed up so bad when he first started that they had to send him back to day shift and back to night shift several times but he still remained employed and continued to have very poor work performance." *Id.* Nevertheless, despite this and other instances in which Plaintiff alleges Medley was a poor employee, Medley "was not terminated until about a month or so after [Plaintiff] was terminated." *Id.*

Plaintiff also took issue with the fact that, less than three weeks after he began working at ABC, he was "forced to go work on night shift" and, while on night shift, he was "put with the black shear operators which had not been employed at [ABC] long." *Id.* at 4. Plaintiff alleged he "felt more safe working with the shear operator who had the most experience and senority [sic] especially with all the incidents that was happening at the time." *Id.* Plaintiff further alleged that he felt generally unsafe in his position and that he was constantly explaining to his supervisor that "the speed he want[ed] me to learn and operate the machine at is not safe for me nor the other shear employees" and that he "can't work that fast and injure or kill someone or possibly injure or kill [him]self." *Id.* at 5.

On January 17, 2020, ABC answered Plaintiff's Amended Complaint. Doc. 13. That same day, Plaintiff filed a document entitled "Amendment Complaint," which stated, "I would like to change my amount that I am suing for from 2.5 million to 5 million dollars." Doc. 12. On June 18, 2020, Plaintiff filed a "Motion to Amend Pleading" (Doc. 34), which

the Court denied (Doc. 35). On August 26, 2020, the Court clarified that the case would proceed "with the claims presented in the plaintiff's amended complaint (Docs. No. 5, 12)." Doc. 41.

## II.    STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248). "An issue is 'material' if it might affect the outcome of the case under the governing law." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in

support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B).

If the nonmovant "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the Court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)–(3).

"In reviewing whether the nonmoving party has met its burden, the [C]ourt must stop short of weighing the evidence and making credibility determinations of the truth of the matter." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992)

(citation omitted). "Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 999 (citations and internal quotations omitted). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

## III.    UNDISPUTED FACTS[2]

ABC is one of the largest and most experienced manufacturers of custom-engineered steel building systems in the world. Plaintiff applied for employment with ABC at its Eufaula, Alabama plant on August 16, 2018. Plaintiff falsely stated on his application that he left his most recent employment at Michelin Tire because he was seeking "more hours" and that he left his prior employment at Lowe's for "better pay." However, both

---

[2] ABC asserted these facts in support of its summary judgment motion. Doc. 44 at 6-20. Plaintiff did not contest—or even mention—any of these facts in his response or any of his subsequent filings. *See* Docs. 47, 49, 53, 56, 58, 59. The evidentiary record further supports the asserted facts. Indeed, Plaintiff specifically admitted many of the facts in his deposition. Accordingly, they are considered undisputed for purposes of this Recommendation. *See* Fed. R. Civ. P. 56(e)(2) (providing that, if the nonmovant "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the Court may "consider the fact undisputed for purposes of the motion"); *see also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302–03 (11th Cir. 2009) (holding district court did not abuse its discretion in deeming admitted the moving party's statement of facts to which the nonmovant failed to respond in compliance with the Northern District of Georgia's substantially similar Local Rule 56.1). Given the lack of dispute and the evidentiary support found in ABC's submission (Doc. 44), for brevity, citations to the record in support of these facts have been omitted.

Michelin and Lowe's terminated his employment for poor performance, and Michelin terminated him during his probationary period.

In August 2018, Jarrett Carter, ABC's Structural Supervisor at the time, interviewed Plaintiff in person for a Shear Operator position at ABC's Eufaula, Alabama plant. On August 30, 2018, Carter offered Plaintiff the job, and Plaintiff accepted that same day. Prior to being hired by ABC, Plaintiff had never held a job like ABC's Shear Operator position or worked with blueprints.

On August 31, 2018, Plaintiff received a copy of ABC's Employee Handbook, which included ABC's policy prohibiting discrimination and harassment based on race and other protected characteristics. ABC's Harassment Policy notified employees that if they felt like they were being harassed, they could report it to their supervisor, Human Resources supervisor, or General Manager.

Plaintiff's duties as a Shear Operator included reading work blueprints; using a scale, square, protractor, and measuring tape to set up stops, jigs, angles, or miter cuts; and operating a large, powered Plate Shear machine to precisely cut pieces of steel weighing between approximately 10 and 2,000 pounds to match specifications in blueprints. It takes two employees to operate a Plate Shear machine, and the process involves using a job crane and vacuum lift to move the metal plates into position; actuate the Plate Shear to cut the metal plate to the specified dimensions; and clear the plate from the rear of the Plate Shear and stack it.

ABC requires newly hired employees to undergo a 90-day Orientation Period, during which ABC closely evaluates their job performance, attitude, and potential abilities

to determine whether they are qualified to become a regular teammate. ABC also requires new hires to participate in an Employee Mentorship Program for a minimum of two weeks to ensure they receive the training needed to perform their job duties successfully and safely. Through this program, ABC assigns an experienced team member to serve as a new hire's mentor and, because the most experienced team members usually work on first shift, which typically operates from 6:00 AM to 2:00 PM, new hires most often begin their employment on first shift.

Under the Employee Mentorship Program, Carter and the assigned mentor review the new teammate's performance at the end of his first week on the job in the areas of Attendance, Safety Awareness, Incident Reporting Procedure Knowledge, Personal Protective Equipment Usage, and Following Job Procedures. Carter and the assigned mentor then continue to evaluate the new teammate as needed until they determine the teammate can work on his own and no longer needs to be in the Mentorship Program.

Plaintiff began his employment with ABC on first shift, and Carter was his supervisor. On August 30, 2018, Plaintiff's first day of work, Carter assigned as Plaintiff's mentor Bernard Warren, who is African American and was at that time ABC's most experienced Shear Operator; Warren was also an experienced mentor, having served in that capacity for six to seven years when he became Plaintiff's mentor. As a mentor, Warren taught newly hired Shear Operators how to read blueprints; use the tools needed to properly measure material to be cut to the specifications listed in the blueprints; and properly and safely operate the Plate Shear machine to make the specified material cuts.

After Plaintiff's first week of training, Carter and Warren evaluated Plaintiff and determined he was making good progress in the areas of Attendance, Safety Awareness, Incident Reporting Procedure Knowledge, Personal Protective Equipment Usage, and Following Job Procedures, could work on his own, and still needed to continue in the Mentorship Program. Carter, Warren, and Plaintiff signed this performance review on September 7, 2018. Carter and Warren next reviewed Plaintiff's performance as a Shear Operator on September 20, 2018, at which time they determined his performance was satisfactory in the areas of Attendance, Safety Performance, and Following Job Procedures, but Warren also wrote on the form that Plaintiff needed to "work more on prints," which meant he needed to work on his ability to correctly read the blueprints specifying how to cut material. Carter and Warren also agreed Plaintiff could continue working on his own and should continue in the Mentorship Program. Carter, Warren, and Plaintiff signed this performance review on September 20, 2018.

On September 27, 2018, after Plaintiff had completed four weeks in the Mentorship Program, Warren and Carter again reviewed Plaintiff's performance. They determined he had made satisfactory progress in the areas of Attendance, Safety Performance, and Following Job Procedures, could work on his own, and no longer needed to continue in the Mentorship Program. With Plaintiff's training complete, Carter transferred him to third shift on October 1, 2018. ABC had a business need for a Shear Operator on third shift, and Plaintiff had indicated in his application he was willing to work that shift. Third shift typically runs from 10:00 PM to 6:00 AM, and it is common for new hires to be transferred to that shift following the completion of the Mentorship Program due to ABC's business

needs and so they can continue to build their skills on a shift that is typically slower paced. When Plaintiff moved to third shift, Billy Jack Williams, the third shift Group Leader, became his supervisor.

On October 16 and 18, 2018, Carter received feedback from Kevin Mitchell, a Floater, that Plaintiff did not understand his job and could not read blueprints. On October 25, 2018, Williams gave Plaintiff a performance evaluation based on his observation of Plaintiff's performance and attendance while working on third shift. Williams notified Plaintiff he needed to improve his poor attendance; his reading and understanding of prints and job procedures; and the quality of his work (too many mistakes) and participate in STOP™, DuPont's Safety Training Observation Program. Williams's evaluation also notified Plaintiff that if he did not understand what he was doing or felt like he needed additional training, he should not hesitate to let management know. Plaintiff signed this evaluation.

The attendance issues identified in Williams's October 25 evaluation concerned Plaintiff's accumulation of three attendance occurrences within 17 days; he left work early on October 3 and 9 and was late to work on October 20. Plaintiff claims he had to leave work early on October 9 to make his commute home before a road curfew went into effect due to an approaching hurricane. Plaintiff was scheduled to work from 7:00 PM on October 9 to 6:00 AM on October 10, and he left work early at 11:00 PM on October 9. The Seminole County Georgia Sheriff's Office issued a press release on October 9, which stated a curfew would be in effect from 8:00 PM on October 10 to 6:00 AM on October 11. The Donalsonville News reported on this curfew and confirmed that it would begin at 8:00 PM

on October 10 and end at 6:00 AM on October 11. Plaintiff believed the curfew began at 2:00 AM on October 10.

On October 26, 2018, the day after Williams went over his performance evaluation with Plaintiff, Plaintiff made two incorrect cuts of material while working as a Shear Operator. A few days later, on November 2, 2018, Plaintiff made two more incorrect cuts of material. These mistakes slow down the processing of material and cause ABC to lose revenue because incorrectly cut pieces must be evaluated to determine whether they can be corrected. If they can, time must be spent making those corrections; if they cannot, the incorrectly cut pieces must be scrapped or held for another order where they can be utilized, and then new pieces must be cut to the customer's original specifications. Williams reported Plaintiff's cutting mistakes to Carter.

Because these mistakes followed so closely on the heels of the performance feedback Williams gave Plaintiff on October 25, Carter issued Plaintiff a documented verbal warning on November 5, 2018. In this warning, Carter reminded Plaintiff that, as a new teammate, his job performance was being evaluated during the first 90 days of his employment and explained to him that, as a 60-day employee, he had not satisfactorily progressed in his ability to cut material properly. Specifically, Carter pointed out that Plaintiff struggled to use the tape measure and square to successfully create product; could not effectively read blueprints; did not take direction well from other teammates in how to progress and get better; and commonly used phrases such as "I know" or "I got it" when he did not really understand what he was being instructed on. Plaintiff admitted making

these mistakes, and he claimed both the mistakes and his difficulty reading blueprints were due to concerns about his safety.

In his warning, Carter also noted Plaintiff's three attendance occurrences within his first 60 days of employment and notified Plaintiff that (1) he expected immediate improvement in his job performance; (2) the future consequences of continued poor job performance would result in discipline ranging from a written warning up to termination; and (3) he would follow up with Plaintiff in one week regarding his performance. In conjunction with the issuance of this documented verbal warning and following a discussion with Williams about Plaintiff's need for further training, Carter decided to transfer Plaintiff back to first shift for further training with Jeremy Jones, an experienced Shear Operator, effective November 4, 2018. Plaintiff was paired with Jones and operated the crane and shear for three weeks and, while tiring, Plaintiff admitted this was a good way to learn how to operate the shear. Plaintiff stated that fatigue was another reason for his mistakes.

On November 10, 2018, Plaintiff again made an incorrect cut of material. As a result, Carter issued Plaintiff a next step Written Warning on November 12, 2018. In this warning, Carter notified Plaintiff that he had still not progressed to a satisfactory level of understanding of how to properly cut material; he must immediately improve his performance; the consequences of future poor performance included another written warning or termination; and he would follow up with him again in one week. Plaintiff claimed his continued mistakes and difficulty reading the blueprints were due to his concerns about his safety.

On November 17, 2018, Plaintiff incurred another attendance point for being absent from work. Then, on November 21, 2018, he again made an incorrect material cut. While working with Plaintiff during his further training on first shift, Jones took notes on Plaintiff's work performance and, on November 23, 2018, he noted that Plaintiff could not identify metal sheets by their tag; could not determine the thickness of metal sheets using a gauge; did not mark measurements on the steel bars as he should have; did not know how to do a bat wing cut; could not tell when a cut required a slope; used incorrect blueprints to make a cut (which caused the cut to be too short); and stood around and checked his phone constantly. Jones reported these observations to Carter.

Because Plaintiff was not improving his work performance and because he had another attendance occurrence within his first 90 days of employment, Carter issued him a second Written Warning on November 26, 2018. This warning notified Plaintiff that, after 85 days of employment, he was not making satisfactory progress on properly cutting material; continued to struggle with using the tape measure and square and reading blueprints to properly cut material; did not retain direction he received from other employees; could receive further discipline ranging from a written warning to termination if he did not improve his performance; and had received four attendance occurrences within his first 85 days. Plaintiff claimed the mistakes addressed in this warning and his continued inability to read blueprints were due to his safety concerns.

Plaintiff's work performance worsened following his receipt of the second Written Warning, as he made eight incorrect material cuts between November 28 and December 7, 2018. On November 29, 2018, Plaintiff again left work early, and Carter issued Plaintiff a

Written Warning for his accumulated attendance occurrences. On that same date, Jones noted that Plaintiff wrote the wrong part number on a piece of cut material; could not identify the drop for a cut; did not properly mark the bar for a trim cut; did not perform a required miter cut; and had to be reminded how many pieces had to be cut as specified in the blueprints. On November 30, 2018, Jones noted that Plaintiff did not understand the shear cutting process; was grabbing the wrong material to cut; was mislabeling parts; and could not use a calculator to calculate cuts. On December 3, 2018, Jones noted that Plaintiff continued to grab the wrong material to cut and could not make a proper miter cut. On December 4, 2018, Jones noted that, on two occasions, he had to stop Plaintiff from making incorrect material cuts. On December 5, 2018, he noted that he again had to stop Plaintiff on multiple occasions from making incorrect material cuts and Plaintiff failed to label parts properly. On December 6, 2018, he noted that Plaintiff incorrectly cut a bar and was not wiping the previous measurement marks from the steel bar before cutting new material with the new measurements specified in the blueprints. Jones showed Carter his notes on Plaintiff's performance during this period.

Based on Plaintiff's 16 cutting mistakes during his first 97 days of employment; his eight cutting mistakes following his second Written Warning; Jones's feedback regarding Plaintiff's poor performance; and the prior feedback from Williams and Mitchell regarding Plaintiff's poor performance, Carter concluded that Plaintiff was not capable of satisfactorily performing the Shear Operator position and that his employment should, therefore, be terminated. Accordingly, Carter terminated Plaintiff's employment on December 7, 2018, and summarized his performance issues as follows:

> The teammate has worked as a shear operator for 97 days and has not progressed to a level of understanding in how to properly cut material. The teammate continues to struggle applying the tape measure and square to successfully create product by the detail/print. The teammate can't read prints effectively. The teammate does not retain the direction given from other teammates in how to progress and get better.

Plaintiff admitted he had all these performance issues and claimed they were due to his concerns about his safety. Carter explained to Plaintiff during the termination meeting that he had cut two wrong size sheets of metal, and Plaintiff admitted he cut the two pieces too short. Carter also told Plaintiff he was terminating him because of his poor performance issues and occurrences and had nowhere to put him.

On October 27, 2016, Carter issued Larry Golden, a white employee, a third Warning Consultation for poor work performance and, on September 28, 2016, he terminated David Arnold, a white Plate Operator. When Carter made the decision to terminate Plaintiff's employment, ABC employed eight Shear Operators, four of whom were African American and had successfully completed their Orientation Period.

Plaintiff alleges white Shear Operators Wayne Medley and Joshua Stafford performed just as poorly as he did during his Orientation Period but were not terminated for such poor performance. ABC hired Medley as a Shear Operator on April 8, 2018. On April 22, 2018, following the completion of Medley's mentorship training period, Carter transferred him to third shift. Medley successfully completed his new hire Orientation Period on July 8, 2018. Thus, Medley completed his Orientation Period before Carter hired Plaintiff. From the start of fiscal week 15 (April 8, 2018) through the end of fiscal week 27

(July 7, 2018), Medley did not have any shift changes during his Orientation Period other than his April 22, 2018 transfer from first to third shift.

During Medley's 90-day Orientation Period, he only made three cutting mistakes, and only made four mistakes during his first 97 days of employment. Carter did not receive any feedback from Medley's Group Leaders or anyone else during his Orientation Period that warranted any discipline. He also did not observe Medley make any such mistakes during his Orientation Period. Medley had only one attendance occurrence during his Orientation Period, and one occurrence did not warrant any discipline.

On November 26, 2018, Carter approved Medley's transfer from his third shift Shear Operator position to a third shift Flange/Plate Line Operator position. Medley had successfully bid on this new position. In conjunction with this job change, Medley temporarily went to first shift to receive training for his new position. By January 13, 2019, Medley completed this training, and Carter approved his transfer back to third shift where he began working the third shift Flange/Plate Line Operator position he had obtained.

Carter hired Stafford as a Shear Operator on June 18, 2018. Stafford successfully completed his Orientation Period on September 18, 2018 and voluntarily quit his employment on July 20, 2020. Stafford only had one attendance occurrence and made no cutting errors during his Orientation Period. Following the completion of his Orientation Period, he received Warning Consultations for his attendance on March 15 and August 19, 2019. During Stafford's Orientation Period, Carter did not receive any feedback from his Group Leaders or anyone else that warranted issuing any discipline to Stafford, and he also did not observe Stafford make any mistakes during his Orientation Period.

## IV.     DISCUSSION

As an initial matter, Plaintiff's Amended Complaint—the operative pleading in this case—does not expressly assert whether he is bringing any claims under Title VII or the bases for those claims. However, construing Plaintiff's pro se pleading liberally, and noting that the allegations in the Amended Complaint are similar to those in the initial Complaint, the undersigned will assume, for purposes of this Recommendation, that Plaintiff purports to bring the same claims specifically proffered in his initial Complaint—that is, that ABC terminated him, subjected him to unequal terms and conditions of employment, and retaliated against him based on his race, color, and national origin in violation of Title VII.

### A.     Plaintiff's Title VII Claims Based on Retaliation, Color, and National Origin

An employee seeking to bring suit against his employer under Title VII must first file an administrative charge of discrimination with the EEOC. *Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005). Generally, a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (quotations and citations omitted). Thus, "[n]o action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge." *Thomas v. Miami Dade Pub. Health Trust*, 369 F. App'x 19, 22 (11th Cir. 2010) (quoting *Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000) (overruled on other grounds by *Manders v. Lee*, 338 F.3d 1304, 1328 n. 52 (11th Cir. 2003))). While the scope of an EEOC charge should

be liberally construed, the proper inquiry is whether the claims in a judicial complaint are like, related to, or grow out of the allegations contained in the EEOC charge. *Gregory*, 355 F.3d at 1280.

To the extent Plaintiff's Amended Complaint purports to assert Title VII claims based on retaliation, color, and national origin, those claims do not fall within the scope of his December 14, 2018 EEOC Charge. In that Charge, when prompted to identify the basis or bases for ABC's alleged discrimination, Plaintiff did not mark the "retaliation," "color," or "national origin" boxes available to him; instead, he marked only the "race" box. Doc. 1 at 9. More importantly, when prompted to describe the particulars of the alleged discrimination, Plaintiff made no mention of any alleged retaliatory conduct—or any conduct by him for which he was allegedly retaliated against—or his color or national origin; instead, he simply indicated that he is African American and specifically stated, "I believe that my employer terminated me because of my race." *Id.* Accordingly, Plaintiff's purported Title VII claims based on retaliation, color, and national origin are not like or related to his EEOC Charge, and they do not grow out of his claim(s) of race discrimination set out in his EEOC Charge. Because Plaintiff did not exhaust his administrative remedies as to his retaliation, color, and national origin claims, ABC is entitled to summary judgment on these claims.[3]

---

[3] *See Ramon v. AT&T Broadband*, 195 F. App'x 860, 865-66 (11th Cir. 2006) (affirming summary judgment on plaintiff's retaliation claim because she did not check the "retaliation" box on her EEOC charge and failed to include allegations necessary to support a retaliation claim); *Reeves v. Columbus Consol. Gov't*, No. 4:21-CV-80, 2021 WL 5451146, at *3 n.2 (M.D. Ga. Nov. 22, 2021) (holding plaintiff's color discrimination claim was barred because her EEOC charge alleged only race discrimination and stating, "[A] claim [of color discrimination] requires more—allegations that skin pigmentation or tone characteristics motivated the [unlawful conduct] apart from race. There are no allegations anywhere in the

### B.      Plaintiff's Unlawful Termination Claim Based on Race

Title VII prohibits employers from discrimination against individuals with respect to compensation, terms, conditions, or privileges of employment because of the individual's race. 42 U.S.C. § 2000e-2(a)(1). In a case like this one, where there is no direct evidence of discrimination, a plaintiff may demonstrate discrimination using the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). To establish a prima facie case of discrimination under this framework, the plaintiff must prove four elements: (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class. *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment action. *Burke–Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). If the

---

charge relating to differences in skin color except for those that use skin color to describe race.[] When read in context, the entire charge does not put the EEOC or Defendant on reasonable notice that [plaintiff] intended to assert a color discrimination charge . . . . To hold otherwise under the circumstances presented here, would mean that race and color discrimination are synonymous under Title VII, which they are not."); *Saenz v. Wilkie*, No. 2:18-CV-1363, 2019 WL 3997077, at *5 (N.D. Ala. Aug. 23, 2019) ("[B]ecause [plaintiff's] EEOC complaint did not allege 'national origin' as a basis for discrimination, or otherwise allege facts concerning national origin, this claim is not 'within the scope of the EEOC investigation which can reasonably be expected to grow out of the initial charges of discrimination.'") (citation omitted); *Francois v. Miami-Dade Cnty.*, 742 F. Supp. 2d 1350, 1353 (S.D. Fla. 2010) (holding plaintiff's national origin claim was barred because he failed to check the "national origin" box and his factual allegations in his charge did not assert national origin discrimination), *aff'd*, 432 F. App'x 819 (11th Cir. 2011).

defendant articulates such a reason, then the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for discrimination. *Id.* "The burden of proving pretext merges with the plaintiff's ultimate burden of proving that [race] was a determining factor in his discharge, and it can be met by showing that a discriminatory reason more likely than not motivated the employer's decision, or by discrediting the employer's proffered explanation." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted). Importantly, however, "[a] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

It is undisputed that Plaintiff is a member of a protected class (African American) and suffered an adverse employment action (he was terminated). However, ABC argues that Plaintiff has failed to satisfy the other two elements necessary to establish a prima facie case—namely, that Plaintiff was qualified for the position in question and that he was treated less favorably than a similarly-situated individual outside his protected class. For the following reasons, the undersigned agrees.

    1. <u>The record does not support a finding that Plaintiff was qualified for the Shear Operator position.</u>

ABC has pointed to evidence in the record demonstrating that Plaintiff was not qualified for his position with ABC. Indeed, Plaintiff does not dispute that, prior to being hired by ABC, Plaintiff had never held a job similar to the Shear Operator position or worked with blueprints. Additionally, he does not dispute that he made numerous mistakes

during his brief time in the Shear Operator position and that he did not meet the legitimate expectations of his supervisors. *See Aldabblan v. Festive Pizza, Ltd.*, 380 F. Supp. 2d 1345, 1352 (S.D. Fla. 2005) (noting that, "where the plaintiff has not enjoyed a lengthy tenure in the position, and the plaintiff otherwise fails to establish that his job performance met the legitimate expectations of his employer," the plaintiff cannot satisfy the qualification element of his prima facie case).

In response, Plaintiff has failed to proffer any evidence whatsoever supporting his claim that he was qualified for the Shear Operator position. Accordingly, Plaintiff has not established a prima facie case of race discrimination. *See Ramsay v. Broward Cnty. Sheriff's Office*, 303 F. App'x 761, 766 (11th Cir. 2008) (holding plaintiff failed to establish prima facie case of race discrimination because, *inter alia*, she "did not introduce any evidence regarding the qualifications of the position or how her experience made her qualified"); *Grooms v. Wiregrass Elec. Co-op., Inc.*, 883 F. Supp. 643, 647 (M.D. Ala. 1995) (granting summary judgment on race discrimination claims where, *inter alia*, the record was "devoid of any evidence that the plaintiff was qualified for the positions at issue").

    2.  <u>The record does not support a finding that Plaintiff was treated less favorably than a similarly-situated individual outside his protected class.</u>

To satisfy the fourth element of a prima facie discrimination claim, a comparator must be "similarly situated in all material respects," meaning that the plaintiff and comparators are "sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021).

Although this standard requires a case-by-case analysis, a similarly situated comparator will ordinarily "(1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history." *Id.* Notably, "[a]n employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—e.g., who engaged in different conduct, who were subject to different policies, or who have different work histories." *Oirya v. Auburn Univ.*, 831 F. App'x 462, 464 (11th Cir. 2020).

In the Amended Complaint, Plaintiff identified Wayne Medley, a white ABC employee, as a potential comparator. In his deposition, Plaintiff also identified Joshua Stafford, another white ABC employee, as a potential comparator. However, the undisputed facts demonstrate that neither Medley nor Stafford were similarly situated to Plaintiff in all material respects.

As to Medley, it is undisputed that, during his Orientation Period as a Shear Operator, Medley made only three cutting mistakes, and he made only four during his first 97 days of employment. Carter did not receive any feedback from Medley's Group Leaders or anyone else during his Orientation Period that warranted any discipline, and he also did not observe Medley make any mistakes that warranted discipline. It is further undisputed that Medley had only one attendance occurrence during his Orientation Period, and one occurrence did not warrant any discipline. As to Stafford, it is undisputed that Stafford made no cutting mistakes and had only one attendance occurrence during his Orientation Period. It is further undisputed that Carter did not receive any feedback from Stafford's

Group Leaders or anyone else during his Orientation Period that warranted any discipline, and he also did not observe Stafford make any mistakes that warranted discipline. Plaintiff, on the other hand, made at least 16 cutting mistakes during his first 97 days as a Shear Operator, accumulated four attendance occurrences during his first 85 days of employment, and received negative feedback from each of his superiors and another coworker that he was not performing his job satisfactorily.

Because Plaintiff accrued significantly more cutting mistakes and attendance occurrences than either Medley or Stafford during the first 97 days of his employment, and because Carter received feedback from Plaintiff's supervisors that warranted discipline and did not receive the same for Medley or Stafford, Medley and Stafford were not similarly situated to Plaintiff in all material respects. *See Luke v. Univ. Health Servs., Inc.*, 842 F. App'x 503, 508 (11th Cir. 2021) (holding coworkers who worked under same supervisor as plaintiff were not similarly situated in all material respects because, unlike with plaintiff, no one complained to the supervisor about the coworkers' tardiness or attendance problems); *Ashmore v. Sec'y, Dep't of Transp.*, 503 F. App'x 683, 687 (11th Cir. 2013) (holding coworker was not similarly situated to plaintiff in all material respects because plaintiff failed to present any evidence that supervisors had reported any disciplinary, capability, or attitude concerns about coworker and, by contrast, plaintiff's supervisors reported that he was unable to comprehend basic concepts and generally showed a lack of energy to learn). Accordingly, for two reasons, Plaintiff has not established a prima facie case of race discrimination.

3. <u>Plaintiff has not demonstrated that ABC's legitimate, non-discriminatory reasons for his termination were false or that the true reason was an intent to discriminate against him based on his race.</u>

Even if Plaintiff had established a prima facie case of race discrimination—and he has not—Plaintiff has failed to demonstrate Carter's performance-related reasons for terminating his employment, which included his 16 cutting mistakes, struggles with applying the tape measure and square to successfully create product, inability to read prints correctly, and inability to retain direction given to him by other employees, were false. Because ABC articulated legitimate, non-discriminatory reasons for Plaintiff's termination, the burden shifts back to Plaintiff to show that these reasons are a pretext for discrimination. Plaintiff has wholly failed to meet this burden; to the contrary, Plaintiff candidly admits he had all these noted performance-related issues. *See* Doc. 45-2 at 227:15-228:2 (When asked if Plaintiff believes he had all the performance-related issues identified in his termination document, Plaintiff states, "Oh, absolutely, I had them, safety"); *see also Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 887 (11th Cir. 2016) (holding plaintiff failed to establish pretext when she admitted engaging in the conduct the defendant asserted as the reason for her termination).

Moreover, even if Plaintiff had established that the performance-based reasons for his termination were false, he has not established that the true reason was an intent to discriminate against him based on his race. It is undisputed that, when Carter made the decision to terminate Plaintiff, four of ABC's eight Shear Operators were African American and had successfully completed their Orientation Periods; the most experienced Shear Operator was African American; and Carter had previously disciplined and

terminated white employees for performance-related issues similar to Plaintiff's. Plaintiff has proffered no evidence whatsoever to support a finding that Carter's termination of Plaintiff was motivated by race. Accordingly, for all the reasons set forth herein, ABC is entitled to summary judgment on Plaintiff's unlawful termination claim.

### C.    Plaintiff's Unequal Terms and Conditions of Employment Claim Based on Race

Finally, to the extent Plaintiff's EEOC Charge could be liberally construed to also encompass an unequal terms and conditions of employment claim[4], and to the extent Plaintiff intended to assert such a claim in his Amended Complaint, Plaintiff nevertheless fails to establish a prima facie case. To assert an unequal terms and conditions of employment claim, as with an unlawful termination claim, a plaintiff must demonstrate the same four elements discussed above: (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside his protected class. *Young v. Atlas Welding Supply Co., Inc.*, No. 2:18-CV-189, 2019 WL 1488863, at *6 (N.D. Ala. Apr. 4, 2019).

In his Amended Complaint, Plaintiff alleges that Wayne Medley was given "more opportunities" than him during his probationary period; "never placed on a weekly evaluation"; and "never harassed and called in the office weekly." *See* Doc. 5. Plaintiff also

---

[4] Although the EEOC Charge does not expressly state such a claim, it does allege that Plaintiff was "scrutinized more closely in [his] work" than white employees; "not provided training" that white employees were provided; and "given write-ups for claimed performance problems" that white employees did not receive. Doc. 1 at 9.

alleges that he was told to "learn and operate the machine" at a speed that was not safe for him or the other Shear Operators and they "all was scared to death." *Id.* To the extent these allegations are intended to form the basis of an unequal terms and conditions of employment claim, they fail to do so because, for the reasons discussed above, Plaintiff has not demonstrated that he was qualified for the Shear Operator position and Medley was not similarly situated to Plaintiff in all material respects. Additionally, as to Plaintiff's safety concerns, there is no evidence to suggest, nor does Plaintiff allege, that only he was directed to learn and operate machinery at an unsafe speed—as opposed to his white coworkers—or that such unsafe direction was due to his race. Accordingly, ABC is entitled to summary judgment on Plaintiff's unequal terms and conditions of employment claim.

## V.   CONCLUSION

For the reasons set forth above, it is the RECOMMENDATION of the Magistrate Judge that:

1.      ABC's Motion for Summary Judgment (Doc. 43) be GRANTED; and

2.      This case be DISMISSED.

It is further ORDERED that:

On or before **December 20, 2021**, the parties may file objections to this Recommendation. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made. Frivolous, conclusive, or general objections to the Recommendation will not be considered. Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the

District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. 11th Cir. R. 3-1; *see Resol. Tr. Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

      DONE this 6th day of December, 2021.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE